LANDRY, Judge.
This is an action ex delicto wherein plaintiff, Sherman M. Passman, seeks damages for personal injuries and related medical expense sustained and incurred in an accident which transpired October 12, 1965, while plaintiff was gratuitously assisting in a hay baling operation being conducted by plaintiff’s brother-in-law, Sidney L. Horns-by, on the Mississippi River levee abutting Hornsby’s farm situated in East Baton Rouge Parish. Hornsby is the insured of the sole defendant, Allstate Insurance Company (Allstate). From the trial court’s rejection of his claims pursuant to defendant’s plea of contributory negligence, plaintiff has appealed. We find the trial court properly dismissed plaintiff’s demands.
We deem it advisable to first dispose of the procedural issue raised herein by appellant’s contention the trial court erred in dismissing his suit on a defense not pleaded, namely, assumption of risk. In this respect, appellant in effect argues the defenses of assumption of risk and contributory negligence are separate and distinct affirmative defenses each of which must be specially pleaded and further that one cannot be substituted for or applied in lieu of the other. On this basis appellant maintains the evidence adduced does not support a finding of contributory negligence but that the trial court nevertheless made factual findings which, if true, would justify application of the doctrine of assumption of risk which defendant did not plead.
Our jurisprudence notes the tendency of the courts to indiscriminately apply the doctrine of assumption of risk to the related principle of contributory negligence. White v. State Farm Mut. Auto Ins. Co., 222 La. 994, 64 So.2d 245, 42 A.L.R.2d 338. That there is some relationship between these principles yet they are distinct and different, is recognized in the White case, supra. The White case, supra, further recognizes that in addition to certain specific examples of contributory negligence therein enumerated, a guest (if plaintiff can be considered such herein) will be denied recovery in tort when he knowingly assumes the risk of riding with an intoxicated driver or one otherwise incompetent. In effect the cited authority establishes that where negligence or dereliction on the part of plaintiff is affirmatively charged and set forth in bar of plaintiff’s recovery in tort, if the asserted *388 rashness be established by defendant, plaintiff may not prevail irrespective of whether the conduct charged is technically labeled contributory negligence rather than assumption of risk.
For some time prior to the date of the accident plaintiff, a bus driver with many years experience, was on sick leave recuperating from a nervous disorder resulting from certain stresses and strains incident to his employment. On the day prior to and on the morning of the day of the accident as well, plaintiff, purely as a diversion, was engaged in assisting Hornsby in gathering hay which had been cut on the levee adjacent to the latter’s farm. The baling operation was accomplished by means of a baler towed by a tractor run by Hornsby, an experienced tractor driver. Plaintiff’s task was to walk behind the baler and prevent the bales of hay from rolling down the slope of the levee as they emerged from the baling machine and fell to the ground. When the baling process was completed, a flat-bed trailer (known as a hay trailer) was employed to gather the hay and transport it to Hornsby’s barn. In collecting the bales, Hornsby operated the tractor which towed the trailer. Plaintiff’s chore was to load the bales on the trailer. At about noon of the day in question, Hornsby announced he had to report to work at about 1:00 P.M., whereupon plaintiff volunteered to gather the unharvested bales of hay remaining upon the levee provided Hornsby secured another tractor driver.
In response to this offer, Hornsby engaged his sister-in-law, Mrs. Toni Hornsby (wife of Hornsby’s brother, Hillary Horns-by). Mrs. Hornsby then drove the tractor while plaintiff continued to load the baled hay onto the trailer. When the trailer was fully loaded, Mrs. Hornsby then proceeded toward the farm gate with plaintiff standing on the side or edge of the trailer holding onto the bales of hay since the trailer had no siding or railing above the surface of its bed and was purposefully so constructed to facilitate the loading and unloading process. When the trailer was fully loaded, Mrs. Hornsby commenced the return to the farm. As she proceeded down the landside of the levee at an angle estimated at about 45 degrees, the trailer overturned throwing plaintiff violently to' the ground resulting in his sustaining severe personal injuries producing virtual total and permanent disability.
The record contains voluminous testimony both pro and con regarding the alleged negligence of Mrs. Hornsby. We pretermit, however, any decision on her reputed dereliction considering the record affirmatively-reflects plaintiff’s full awareness of the danger attending his riding upon the trailer while it was being pulled by a tractor operated by Mrs. Hornsby who- had limited experience in tractor driving and who had never before driven such a machine up or down a steep levee. It further appears that in permitting Mrs. Hornsby to drive the tractor while ascending and descending the levee, plaintiff acted in direct contravention of instructions given him by plaintiff’s brother-in-law. We think it clear beyond doubt that plaintiff was fully informed and apprised of the dangers incident to letting Mrs. Hornsby drive the tractor any place but upon the flat top or crest of the levee as instructed and advised by Sidney Hornsby. We likewise find that in permitting and requesting Mrs. Toni' Hornsby to operate the tractor contrary to Hornsby’s express directions, plaintiff assumed the risk of the hazards attending plaintiff’s deliberate disregard thereof.
The question is, of course, factual. It is uncontroverted that Mrs. Toni Hornsby had previous limited experience in operating a tractor on flat ground but had never before driven a tractor on the slopes of the levee.
Sidney L. Hornsby testified the levee in question is about 150 feet from toe (bottom) to crown (top). He further stated he considers the slope to be steep although the angle of slope is less on the landside than the riverside. In Hornsby’s estimation, it is *389 dangerous for an inexperienced operator to drive a tractor either up or down the levee (particularly on the riverside as the slope is steeper) without special instruction on how to handle the machine under such circumstances. He explained that safe operation depended upon the tractor being continuously operated in low gear with the clutch fully engaged. This, he stated, gave additional braking power enabling the tractor to be kept under complete control, particularly while descending the levee with a loaded trailer in tow. He explained further that, in either a high gear or with the clutch disengaged, the tractor would pick up such speed going downhill that it could not always be stopped completely even if its mechanical wheel brakes were applied full force. He further explained that the degree of danger and ability to stop the tractor going downhill was increased by such factors as the wetness of the levee grass and holes and ruts in the levee surface. According to Hornsby, on wet grass and with the tractor in low gear with clutch engaged, he could not stop the tractor going downhill despite his applying the foot brakes with all his strength. He was apprehensive that in an emergency Mrs. Toni Hornsby, who weighed approximately 100 pounds, would not have the physical strength to' control and stop the machine, particularly if it was going downhill.
That Hornsby clearly, explicitly and precisely pointed out to plaintiff the potential dangers incident to plaintiff’s letting Mrs. Toni Hornsby drive the tractor either up or down the levee is graphically shown in the following excerpts from Hornsby’s testimony:
“A Well, anyhow, I asked her if she would mind driving it down the top of the levee on even ground, and I cautioned her not to drive up the levee nor down the levee, as I did Mr. Pass-man. I told him to be sure that he did the driving up and down the levee, because I knew the dangers, and since he was more familiar with driving that type of vehicle since he drove a city bus, I felt that he should be the one to do it, and she did go with him.
Q Do you know whether or not Mrs. Toni Hornsby — is that her name?
A Yes.
Q —whether or not she had ever driven that tractor or any other tractor on that levee or any other levee ?
A No, specifically, I can’t say that.
Q Do you know whether or not she had ever driven a tractor on the place?
A No, I don’t.
Q Do you know whether or not Mr. Sherman Passman had ever driven a tractor, that tractor or any other tractor on that levee?
A I just don’t know.
Q Do you know whether Mr. Passman had ever driven that tractor or any other tractor on your place?
A No, I don’t know that either.”
(Record Pages 62-63)
At pages 75-76 of the record, we find:
“Q Sir, I’m interested in this conversation you had with Mrs. Hornsby, Toni, and Mr. Passman before they continued the hay-baling operation that you had to leave. Now I take it from the questions asked you and your answers already that you took pains to explain to Mr. Passman and Mrs. Hornsby about the operation of the tractor?
A Yes, I did.
Q And you told both Mr. Passman and Mrs. Hornsby that Mrs. Hornsby could only operate the trailer on top of the levee.
A I told them not to let her drive up or down.
*390 Q And you told them both that at the same time?
A Both of them.
Q Did you state your reason to them as to why she should not operate the tractor going down or up?
A Yes.
Q What reason did you give, sir?
A I told them it would be very dangerous if she, that she would not be powerful enough if an emergency arose in which she had to stop the tractor, although I did caution them very, very severely and strictly, as well as I know how, even demonstrated to them the position of the gears, not to step on any clutch, no brakes, and use the hand clutch and pull it back to them, leave it in the lowest gear, and it would only go at a very, very low speed—
Q And what speed would—
A —and that way it could do very little damage unless, of course, it was not stopped.”
From Pages 86-87 of the record we cite:
“Q Well, sir, did you tell Mr. Passman and Mrs. Hornsby why it was dangerous or why it would be dangerous for Mrs. Hornsby to operate that tractor up and down the levee?
A Yes.
Q And what reason did you give them ?
A I hold them that if she made a mistake on it it would go down that thing and if it were on the other side of the levee she might wind up in that canal over there, bar pit, and I told her that thing was dangerous and if it were not operated exactly like I told them it could be dangerous to either one, because I told them it was a tremendous weight behind it and if they did not operate it according to instructions that it would be extremely dangerous to operate it that way.”
The testimony of Mrs. Toni Hornsby not only confirms Hornsby’s above cited testimony but also corroborates Hornsby to the effect such instructions, advice and warnings were given in plaintiff’s presence and were thoroughly understood by plaintiff.
Appellant, however, first denied such instructions were forthcoming from his brother-in-law. Later he testified that if they were given they were not rendered in his presence or that he did not hear them.
Regarding appellant’s alleged lack of knowledge concerning Mrs. Hornsby’s inexperience, the following testimony was elicited on cross-examination from appellant with respect to answers to questions propounded in a deposition taken prior to trial.
“Q Were you present when Mr. Horns-by asked Toni Hornsby to drive the tractor ?
A Yes, sir, I was.
Q And isn’t it true that Mrs. Hornsby said she didn’t want to do it ?
A I don’t remember if she said that or not, sir. It has been so long.
Q Yes, sir. Let me read you from page fifteen of your deposition. Do you remember when that was taken, Mr. Passman?
A Yes, sir.
Q This gentleman here, Mr. Moore, was with you when it was taken. Do you remember that, sir?
A Yes, sir.
Q ‘Q — And then what happened ? A— Then close to 3:00 o’clock he had to go to work, had to leave for work, so his sister-in-law was there and he asked her if she would drive the tractor while I loaded the hay on the wagon, and she agreed after a little hesitation. She had never driven on the levee before, *391 but she agreed to go along with it, and so we proceeded out to hauling hay.’ Now was that your testimony then ?
A The best I remember, yes, sir, that’s the way it was.
Q And that’s your testimony now—
A Yes, sir.
Q —that and that’s about the way it was?
A Yes, sir.
Q Do you recall why she didn’t want to drive that tractor?
A Well, I don’t think she was physically able to drive, to tell you the truth, and she wasn’t used to driving on the levee.
Q You knew that then yourself, didn’t you?
A No, sir, I didn’t know it at that time.
Q You didn’t know that she wasn’t physically able to drive the tractor?
A Well, I didn’t know that she had never driven on the levee before.
Q You didn’t know that?
A No, sir.
Q Well, why did she say she didn’t want to drive the tractor?
A I don’t know.
Q You don’t recall?
A No, sir, I don’t recall.
Q Did you think it was dangerous for her to drive that tractor on the levee?
A Well, I didn’t know how much experience she had until after, afterwards.
Q Really and truly didn’t you know that she had never driven a tractor on the levee before?
A No, sir, I didn’t know.”
(Record Pages 240-242.)
Although in the latter part of the quoted excerpt plaintiff seeks to establish that his knowledge of Mrs. Hornsby’s lack of experience was not revealed until after the accident, we find the clear import of the testimony as a whole establishes the contrary.
It is undisputed that before starting down the levee just before the accident happened, Mrs. Hornsby stopped the tractor on the crown of the levee and suggsted that plaintiff drive down the levee. Plaintiff declined stating in effect that he was too exhausted to drive and urged Mrs. Horns-by to continue driving.
In applying the doctrine of assumed risk herein, we deem it of considerable significance (though not exclusively so) that appellant had the absolute right of control over the vehicle in question at the time of his injury. We wish it understood, however, we do not rest our finding herein solely on said right of control but upon the entirety of the facts and circumstances peculiar to the case at hand.
Nor do we find any merit in appellant’s argument that since Mrs. Hornsby had some prior experience in driving tractors, plaintiff was entitled to presume she was capable of safely operating the tractor up and down the levee slopes and therefore may not be charged with knowledge of her incompetence in this regard. The herein-above cited portions of plaintiff’s testimony convinces us beyond doubt plaintiff was fully aware Mrs. Hornsby had never previously driven a tractor up or down a levee. Assuming, arguendo, plaintiff did not have such knowledge, nevertheless, being himself inexperienced in such matters, it behooved plaintiff to heed the advice, warnings and admonitions of his experienced brother-in-law not to permit Mrs. Horns-by to operate the tractor either going up or coming down the levee. The potential dangers were vividly explained to plaintiff in language of unmistakable import. We can only conclude it was most imprudent on plaintiff’s part to completely ignore such *392 dire warnings of possible danger and permit Mrs. Hornsby to operate the vehicle in direct violation of such instructions. We find it even more reckless on plaintiff’s part to remain on what the record discloses to be a most precarious perch (a three inch ledge protruding beyond the stacked bales of hay) while the trailer was being hauled down the steep grade of the levee under the circumstances shown.
Accordingly, the judgment of the trial court is affirmed at appellant’s cost.
Affirmed.
REID, J., recused.
Refused, en banc. Reid, J., recused. Inasmuch as one of the judges on the panel which decided this case was recused, the Court considers it advisable to consider the application for rehearing en banc.